# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 23 2018, 5:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Marion County Public Defender Agency
Indianapolis, Indiana

Anna Onaitis Holden
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE[1]

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Katherine A. Cornelius
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of B.D., Mother, and S.D., Minor Child,

B.D.,

*Appellant-Respondent,*

v.

February 23, 2018

Court of Appeals Case No.
49A05-1708-JT-1931

Appeal from the
Marion Superior Court

The Honorable
Marilyn A. Moores, Judge
The Honorable
Larry Bradley, Magistrate

---

[1] On November 29, 2017, DeDe K. Connor filed an appearance for Child Advocates, Inc.; however, Child Advocates, Inc. did not file a separate appellee's brief.

| Indiana Department of Child Services, | Trial Court Cause No. 49D09-1605-JT-487 |
|---|---|

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem.*

**Kirsch, Judge.**

[1] B.D. ("Mother") appeals the juvenile court's order terminating her parental rights to her child S.D. ("Child"), raising the following restated issue: whether the judgment terminating Mother's parental rights was clearly erroneous because there was insufficient evidence that termination was in Child's best interests.

[2] We affirm.

## Facts and Procedural History

[3] Child was born on July 28, 2008 to Mother and K.R. ("Father").[2] In April 2014, DCS filed its petition alleging that Child was a child in need of services

---

[2] Father was convicted of having sexually abused Child's half-sister, H.A., and he was incarcerated at the time of Child's termination hearing. In December 2016, Father signed consents for Child's adoption. Father does not participate in this appeal.

("CHINS").[3] The 2014 CHINS petition ("CHINS petition") alleged, in pertinent part, that Mother had failed to or was unwilling to provide Child with a safe, stable, and appropriate living environment. Mother had an extensive history with DCS and was, at that time, involved in a CHINS action regarding her daughter H.A.[4] Child's CHINS petition alleged that Mother lacked stable housing and had moved numerous times in the months preceding the filing of the CHINS petition. Further, Mother had not successfully demonstrated the ability to provide Child with a safe, stable, appropriate home. Accordingly, the CHINS court determined that its coercive intervention was necessary to ensure Child's safety and well-being. After the initial hearing, DCS removed Child from Mother's care, and Child was placed in foster care.

[4] On May 28, 2014, Child was adjudicated to be a CHINS, and that same day, the CHINS court proceeded to a dispositional hearing. The CHINS court's parental participation decree ordered Mother, in part, to participate in: (1) home-based counseling; and (2) domestic violence assessment and the recommended services. The permanency plan for Child remained reunification until April 13, 2016, at which time the CHINS court changed the plan to adoption. DCS filed its petition to terminate Mother's parental rights on May

---

[3] Mother had four children, H.A., M.D., J.D., and Child. The CHINS petition alleged that Child and two of her half-siblings, H.A. and J.D., were CHINS; however, Child is the only subject of the instant appeal.

[4] A CHINS petition regarding H.A. and M.D. was filed in March 2013. *Tr. Vol. II* at 169. Mother testified that she walked "in the bedroom catching [her] oldest[, H.A.,] rape her middle daughter[, M.D.]." *Id.* Mother did not successfully complete services to remedy the reasons for DCS's involvement regarding H.A., and H.A. was not returned to Mother's care. Mother admitted that she did not want H.A. to return to the home due to H.A.'s history of sexually abusing her siblings.

13, 2016. On June 22, 2017, more than three years after Child had been removed from Mother's care, the juvenile court held a hearing on the petition to terminate Mother's rights.

[5] At the termination hearing, Cura Lester ("Lester"), Child's foster care case manager at Children's Bureau, testified that she visited Child at least once a week, visited Child's school at least twice a month, but had little contact with Mother. Lester said that Child could have explosive temper tantrums, where intervention was necessary. *Tr. Vol. II* at 11-12. It was Lester's opinion that Child should remain in her current placement with her foster mother, and she "recommended adoption of [Child] . . . just for stability and consistency for her." *Id*. at 12. Lester said that change was difficult for Child to understand— she required routine, consistency, and an understanding of what is going on day to day.

[6] Elwanda Haynes ("Haynes"), a home-based therapist at Gallahue Behavioral Health, testified that she began treating Child in August 2014, when Child was five years old. *Id.* at 105. Child's demeanor during sessions varied "depending on what was going on that day." *Id*. at 106. "If she had a good day, she was fine and we could . . . talk about things" like feelings and behaviors. *Id*. at 106-07. If Child "got in trouble in school, she was very defiant," and she did not want to talk or participate in the session. *Id*. at 106. Child's defiant behaviors included yelling, screaming, and running away. *Id*. at 107. Child's case was closed with Haynes in December 2015 because Child began working with

another therapist, who was able to deal with Child's mental health and sexualized behaviors. *Id*. at 106.

[7] Patricia Phelps ("Foster Mother") testified that, due to no fault of Child, Child was removed from the first foster home, and in May 2015, she was placed in therapeutic foster care with Foster Mother. *Id*. at 10, 86. Foster Mother, who was seventy-seven years old, testified that she had been a foster parent since 1973, had fostered thirty-six children, and had adopted sixteen. *Id*. at 86, 100. In addition to Child, there were three other children living in Foster Mother's home, an adopted daughter and two "medically fragile" foster children. *Id*. at 87. Foster Mother said that there was a "strong rule" in the family: "I don't touch you and you don't touch me." *Id*. at 90. Child was allowed to interact with the medically fragile children, but only when Foster Mother or a nurse was present. Even so, Foster Mother stressed, "[W]e do not push a deep relationship with these kids because . . . they're probably not going to live long and . . . [Child]'s already had her share of issues . . . so we make sure they [Child and other adopted child] build a life that's not included with the [medically fragile] kids." *Id*. at 95.

[8] Foster Mother testified that Child was, initially, well behaved, but that changed a few months later when Child began exhibiting some destructive behaviors. Child would peel paint off woodwork and eat it. *Id*. at 102-03. Foster Mother testified that Child started throwing tantrums at home, and at school, "she was leaving the classroom, she was stealing. She was all of a sudden out of the clear blue cussing the teacher, [and] throwing chairs at the children." *Id*. at 90.

Child also displayed sexualized behaviors, including: (1) approaching random men or neighborhood boys, explaining the different sexual acts she could perform, and asking if they were interested; (2) masturbating with potentially dangerous objects; and (3) intentionally urinating on her clothing. *Id*. at 92, 101-02. Foster Mother testified that there was a correlation between visits with Mother and Child's sexualized behavior. *Id*. at 94. Child would go weeks without a visit, and the sexualized behavior would go away; however, after visits with Mother, Child would act out sexually. *Id*. Child's behavior interfered with her education; "she was on the first-grade level for three years," even having had a tutor for five days a week. *Id*. at 103. Child was treated by various mental health providers, and her medication was adjusted over time. Foster Mother testified that those changes made a "remarkable difference," saying, "[Child] can keep her mind on things. Um she can um think before she acts." *Id*. at 93. Foster Mother testified that she was willing to adopt Child. *Id*. at 94.

[9] Gabrielle Young ("Young"), a home-based therapist at Family Works, testified that Child began working with her in July 2015. Child met with Young once or twice a week and treatment goals included working on Child's "sexually reactive behaviors." *Id*. at 45, 51. Child said that Father had touched her "down there" and made her touch him in certain places. *Id*. at 58-59. She also said that her half-sister, M.D., had touched her inappropriately. *Id*. at 60. Additionally, Child had witnessed domestic violence between Mother and Father and between Mother and other men. *Id*. at 59-60. Young spent a long

time trying to get Child to express and regulate feelings and emotions, as well as learning body boundaries. *Id*. at 45-46. Child would sometimes talk about "rubbing herself down there." *Id*. at 57. Sometimes, Child acted inappropriately during sessions, including intentionally spreading her legs and dancing inappropriately. *Id*. at 46-47. Young attributed Child's behaviors to past sexual trauma. *Id*. at 57. Young testified that Child has "a very complex trauma history," so it is "important for her to feel stable, to feel secure and not to increase her anxiety." *Id*. at 52.

[10] Meghann Banks ("Banks"), a care coordinator at Choices, testified that she began monitoring Child's "progress and treatment" in September 2016. *Id*. at 30, 32. At that time, Child had a "behaviorist" and home-based therapy. *Id*. at 32. Banks testified that, initially, Child's behavior fluctuated. However, three or four months before the termination hearing, Child was referred to and participated in Applied Behavioral Analysis ("ABA"), "an intensive service that is used to address behaviors." *Id*. at 33, 37. As part of the ABA, Child was provided with an educational mentor. *Id*. at 31. Banks said that Child's behavior improved after ABA was put into place.

[11] Shirley Perez ("Perez"), a DCS Family Case Manager ("FCM") who had worked with the family for two years, testified that Mother had trouble complying with services. *Id*. at 117. Perez testified that, in the spring of 2016, DCS recommended that Mother have unsupervised visits with Child. Because Child was having "suicidal thoughts," a safety plan was created, requiring Mother to call 911 if Child "were to do something." *Id*. at 123. When Child

put a jump rope around her neck and threatened to harm herself, Mother did not comply with the safety plan. *Id.* Perez testified that Mother's non-compliance created concern as to whether Mother could provide Child a stable home. Child's stability was important because Child "has such high anxiety that if anything changes just a bit it, it just throws her off completely." *Id.* at 127. Perez had "personally requested to keep the case just to make sure that it [didn't] throw [Child] off even with an FCM coming to the home." *Id.* Perez testified that it was in Child's best interests to "be adopted by the current foster parent" because Foster Mother can take care of Child's needs. *Id.* Perez testified that Foster Mother was "a strong advocate" in regard to getting necessary referrals, medication, and therapy to meet Child's needs. *Id.* at 127-28.

[12] Mark Bass ("the GAL"), a guardian ad litem for Child Advocates, Inc., testified that as part of his involvement with Child's case he had attended court hearings, reviewed court reports, provider reports, and school documents, spoken with numerous providers, and visited Mother at home. *Id.* at 143. The GAL testified that, typically, an individual like Child would be placed in residential treatment; however, that was avoided because Foster Mother has been "that much of an advocate" for Child. *Id.* at 145. Foster Mother has been able to handle Child's outbursts, school issues, and sexually acting out. The GAL stated, "[I]t takes an experienced person and a person with a big heart to be able to, to handle that stuff. Um and [Foster Mother's] experience has helped her do that[,] and in the years I've been doing this[,] a lot of foster

parents aren't capable of that." *Id*. at 146. The GAL said that Mother had been given a sufficient amount of time, but had been unable to complete services. He said that Child needed consistency and stability to properly develop; he recommended that Child's permanency plan should be adoption. *Id*. at 147.

[13] In April 2016, Mother was referred to Family Works provider Bertha Rush ("Rush"), who helped Mother with home-based therapy and monitored supervised visitation between Mother and Child. Rush testified that Mother did well overall. Rush opined that Mother had made progress; however, Rush expressed concerns because she "didn't see a long duration of stability. Um often times that would change within a month or two." *Id*. at 195. Rush stopped providing services for Mother in February 2017, when she had not heard from Mother "in about a month." *Id*. at 196. The juvenile court entered its order, on August 2, 2017, terminating Mother's parental rights to Child. Mother now appeals.

## Discussion and Decision

[14] Mother contends that the juvenile court erred in terminating her parental rights to Child. Specifically, she contends that termination is not in Child's best interests because Child "has an undisputed, heightened need for consistency and permanency," which is inconsistent with DCS's plan that Child be adopted "by an elderly woman who fosters medically fragile children who may not live long." *Appellant's Br*. at 4. "'The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and

raise their children.'" *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)). "The parent-child relationship is one of the most valued relationships in our culture." *Id.* (internal quotations omitted). "However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his [or her] responsibility as a parent." *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013) (citing *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*). Further, "'children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships.'" *In re K.T.K.*, 989 N.E.2d at 1230 (quoting *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)). Therefore, parental rights are not absolute and must be subordinated to the child's best interests in deciding the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

[15] The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re D.P.*, 994 N.E.2d at 1231. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[16] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re K.T.K.*, 989 N.E.2d at 1229; *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

We consider only the evidence and any reasonable inferences therefrom that support the judgment, and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. In evaluating whether the trial court's decision to terminate parental rights is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody.

*In re K.T.K.,* 989 N.E.2d at 1229-30 (internal citations omitted) (internal quotations omitted).

[17] As is pertinent to this appeal, to involuntarily terminate Mother's parental rights, DCS had to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

. . . .;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[18] Mother does not challenge the following findings made by the juvenile court: (1) Mother's therapy—to cope with anger and understand Child's needs—closed in April 2017 after a month where Mother had no contact with provider; (2) in 2014, Child had violent tantrums, screamed, and threw objects, which Mother thought was typical behavior of a young girl; (3) therapist Young treated, for two years, Child's sexual trauma, which was caused by being molested by Father and half-sister and by witnessing Mother as victim of domestic abuse; (4) Young has been opposed to unsupervised visits throughout the CHINS case, based on [Mother]'s lack of consistency and stability, and believes that Child should not be returned to Mother's care; (5) Child sexually acts out and has had issues with body safety boundaries; (6) Mother agrees that Child displays behavior of having been sexually abused, but initially blamed Child's behavior on foster care; (7) Mother minimizes Child's need for treatment and believes everything would be fine if Child came home; (8) Child

is doing well with Foster Mother and has made a lot of progress with decreased anxiety and increased understanding of boundaries; (9) Child's inappropriate behavior coincided with parenting time and was triggered by exposure to older men and Mother; (10) Mother was inconsistent in exercising her parenting time and cancelled visits at the last minute, negatively affecting Child; (11) at the time of the termination hearing, Child had lived with Foster Mother for over two years; (12) Foster Mother has agreed to adopt Child; (13) Foster Mother is patient, calm, and a strong advocate in meeting Child's special needs; and (14) while Mother loves Child and the two have a bond, stability is important to Child to keep her anxiety low; (15) Child needs routine and consistency in order to thrive. *Appellant's App. Vol. II* at 17-18.

[19] Further, Mother does not dispute the juvenile court's conclusions that "[t]here is a reasonable probability that the conditions that resulted in [Child]'s removal and continued placement outside the home will not be remedied" and "[t]here is a reasonable probability that the continuation of the parent-child relationship poses a threat to [Child]'s well-being."[5] *Id.* at 18. As a result, Mother has waived any argument relating to these unchallenged findings and conclusions. *See In re B.R.,* 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure

---

[5] Mother states, she "acknowledges, *without conceding*, that there is evidence in this case that may prove one or both of the elements set out in Indiana Code Section 31-35-2-4(b)(B)." *Appellant's Br.* at 17 (emphasis added). Notwithstanding Mother's apparent attempt to keep those issues alive on appeal, Mother makes no cogent argument that the juvenile court's findings as to those two matters are clearly erroneous. Failure to make a cogent argument waives the issue for appellate review. *Crider v. Crider*, 15 N.E.3d 1042, 1071 (Ind. Ct. App. 2014), *trans. denied.*

to challenge findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied*. Instead, Mother's argument folds together two requirements, claiming (1) that the termination is not in Child's *best interests* because (2) the *plan* for Child, which is "adoption by an elderly woman who fosters medically fragile children who may not live long," is not a satisfactory plan. *Appellant's Br*. at 4. We remind Mother that these two requirements are separate inquiries.

### *1. Best Interests*

In deciding whether the termination of parental rights is in the best interests of a child, the juvenile court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*. In making that determination, the juvenile court must subordinate the interests of the parent to that of the child involved. *Id*. The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id*. Here, Mother recognizes that Child needs stability and consistency. *Appellant's Br*. at 18. Mother also understands that "[p]ermanency is a central consideration in determining the best interests of a child." *Id*. at 19 (quoting *In re G.L.*, 904 N.E.2d 1257, 1265 (Ind. 2009)). That being said, "a need for permanency, alone is not a sufficient basis for terminating parental rights." *In re A.S.*, 17 N.E.3d at 1006.

Here, permanency was a consideration, but it was not the sole basis for the termination of Mother's parental rights. The evidence before the juvenile court revealed that Child and two of her siblings were sexually molested while under

Mother's care, and Child witnessed Mother being a victim of domestic abuse. *Tr. Vol. II* at 60, 156, 169. Upon leaving Mother's care at age five, Child had violent tantrums, screamed, and threw objects, which Mother thought was typical behavior of a young girl. *Id*. at 11, 173. Child sexually acted out and had issues with body safety boundaries; Mother initially blamed Child's behavior on foster care. *Id*. at 79-80. Mother minimized Child's need for treatment and believed that everything would be fine once Child came home. *Appellant's App. Vol. II* at 17. Child's inappropriate behaviors coincided with parenting time, and triggers of those behaviors were exposure to older men and to Mother. *Tr. Vol. II* at 64-65, 131. Mother was inconsistent with her visitation and would cancel at the last minute, which negatively impacted Child. *Id*. at 13. At the time of the termination hearing, Child had lived with Foster Mother for two years, was doing well, and had made a lot of progress with decreased anxiety and increased understanding of boundaries. *Id*. at 86, 93. Mother's therapy, addressing Mother's ability to cope with anger and understand Child's needs, was terminated after Mother was out of communication with provider Rush for about a month. *Id.* at 196. Finally, Child needs routine and consistency in order to thrive. *Id*. The juvenile court did not err in concluding there was sufficient evidence that termination of Mother's parental rights was in Child's best interests. Mother's arguments to the contrary are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004) (appellate court cannot reweigh evidence or judge the credibility of witnesses), *trans. denied*.

## 2. Satisfactory Plan

[22] Mother contends that, considering Child's needs for stability, it was an improper plan to place Child with Foster Mother. Considering the requirements of Indiana Code section 31-35-2-4(b)(2)(B), we restate Mother's argument as whether DCS has a satisfactory plan for Child's care and treatment. Mother asserts that Foster Mother's age of seventy-seven years old, and her care for medically fragile children in her home creates an uncertainty regarding how stable Foster Mother's home will be for Child. To terminate Mother's parental rights, the juvenile court did not need to judge the appropriateness of Foster Mother's home; instead, it was required only to determine whether DCS had a satisfactory plan for Child.

[23] "Indiana courts have traditionally held that for a plan to be 'satisfactory,' for the purposes of the termination statute, it 'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d at 1007 (quoting *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*). A DCS plan is satisfactory if the plan is to attempt to find a suitable parent to adopt the child. *Id.* In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will try to find a suitable adoptive parent. *Id.* Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the child. *Id.* Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to decide whether an adoptive placement is appropriate. *Id.* Here, DCS

had a plan that Child would be adopted. Based on these standards, we conclude that DCS's plan that Child be adopted was a satisfactory plan. Accordingly, we need not discuss whether Foster Mother is a suitable adoptive parent, that question will be within the jurisdiction of the adoption court. *Id.*

DCS presented sufficient evidence that termination was in Child's best interests, and that adoption was an appropriate plan.

Affirmed.

Bailey, J., and Pyle, J., concur.